## McDONNELL v. WASENMILLER.
### No. 10048.

Circuit Court of Appeals, Eighth Circuit.
Nov. 26, 1934.

Harley H. Stipp, of Des Moines, Iowa, and Fred C. Foster, of Lincoln, Neb. (Perry W. Morton, of Lincoln, Neb., on the brief), for appellant.

L. Ross Newkirk, of Omaha, Neb. (Clifford L. Rein, of Lincoln, Neb., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal by Robert E. McDonnell from a judgment for $20,000 against him entered upon the verdict of a jury in favor of plaintiff, the personal representative of Alexander Wasenmiller, deceased, in an action for damages for alleged negligence resulting in death. The decedent died from injuries inflicted by the escape of steam in the steam tunnel of the heating plant which supplies the University of Nebraska and the State Capitol, at Lincoln, Neb.

The action was begun in the state court against Robert E. McDonnell, senior member of the copartnership engaged in the business

of civil engineering under the firm name of Burns & McDonnell Engineering Company (Rowland v. Shephard, 27 Neb. 494, 43 N. W. 344; First Nat. Bank v. Sloman, 42 Neb. 350, 60 N. W. 589, 47 Am. St. Rep. 707; Stone v. Neeley, 42 Neb. 567, 60 N. W. 965; Hanna v. Emerson, 45 Neb. 708, 64 N. W. 229; Independent Elevators v. Davis, 116 Neb. 397, 217 N. W. 577), the copartnership of Grant & Fulton and its individual members, and the Board of Regents of the University of Nebraska, the employer of the deceased, by reason of the right of subrogation which accrues to the Board under the Nebraska Workmen's Compensation Act. Comp. St. Neb. 1929, § 48-118; Bronder v. Otis Elevator Co., 121 Neb. 581, 237 N. W. 671. On Saturday, March 11, 1933, an order dismissing the case without prejudice was entered in the state court reciting that it was "by stipulation" and requiring each party to pay his own costs. On the following Monday, March 13th, at the same term of the court, motions were filed by the plaintiff and the defendant, University of Nebraska, to vacate the order of dismissal and reinstate the case. Objections were filed to the motions and after a hearing the state court sustained the motions and reinstated the case. Thereupon Robert E. McDonnell obtained removal to the federal court and some months later filed a so-called supplemental answer to the plaintiff's petition in which he alleged that the order of the state court vacating the dismissal and reinstating the case was void for want of jurisdiction of the court and that the order of dismissal should be held to bar further proceedings in the case. The Federal District Court sustained a motion to strike the supplemental answer from the files and there was a jury trial resulting in the judgment against Robert E. McDonnell, from which he prosecutes this appeal.

It appears that a Joint Commission, consisting of the Capitol Commission and the Board of Regents of the University of Nebraska, was created, pursuant to statute, for the purpose of providing a heating plant to serve the University and the State Capitol at Lincoln. In May, 1929, the Commission engaged the services of Burns & McDonnell Engineering Company to make the necessary preliminary estimates, surveys, and investigations of the proposed power, heat, and light plant improvements; to "prepare detailed working plans and complete specifications covering all parts of the final work for which funds are authorized"; "to furnish the contract forms for contractors"; "to attend the letting of contracts and construc-tion"; to advise the Joint Commission in the "proper selection of materials and equipment"; "to furnish a competent and experienced engineer for the supervision of the proposed improvement," such supervising engineer's services to begin "at the notification of the owner that the contractor is ready to begin construction work" and to "terminate at the final completion of construction work." Upon completion of the construction work the engineers agreed to conduct final operating tests of the entire completed works.

Grunwald & Co. was awarded a contract for the construction and installation of the heating plant equipment in a building on the campus of the University and W. H. Pearce Company was awarded a contract for the construction and installation of the underground conduit system from the Capitol to the heating plant. The north end of the conduit piping ran through a concrete tunnel 7 feet high and 8 feet wide for about 1,100 feet and the conduit system when connected with the heating plant formed the complete heat generating and conveyor system.

Burns & McDonnell Engineering Company made all the preliminary surveys and estimates and prepared the plans and specifications for the construction work on the whole project. A representative of the company met with and advised the Commission on the letting of the contracts, approved the contract with W. H. Pearce Company, prepared the Grunwald contract, and, through their supervising engineer, Mr. Meseck, had constant supervision of the work from September 23, 1929, until December, 1930.

The Commission also entered into an agreement with Grant & Fulton, local engineers, by which the latter were to inspect the materials and supervise the installation of the conduit line. The agreement provided that they were to collaborate with the firm of Burns & McDonnell, "who are to furnish consultant service on the conduit work which firm will specify the sizes of pipe and conduit and approve design."

W. H. Pearce Company completed the conduit line from the Capitol to the heating plant about February 1, 1930. The north end of this conduit line consisted of a section of 10-inch pipe about 20 feet long extending from the last expansion joint in the tunnel to a point just beyond the south wall of the basement of the heating plant. At that time construction of the heating plant by the Grunwald Company had not begun, hence no connection or joinder could be made with the pipe line thus completed by the Pearce Com-

pany. In February, 1930, Mr. Lambert, of Burns & McDonnell Engineering Company, inspected the conduit work done under the Pearce contract and approved it for final payment. On June 19, 1930, after another inspection, Mr. Lambert directed the W. H. Pearce Company to do certain work of tightening, replacing, and packing of joints. Inspection of the conduit was made after the accident by representatives of the same company and it submitted a formal report to the Commission containing recommendations for certain alterations.

The construction of the heating plant by Grunwald & Co. was begun in March, 1930, and continued until September 6, 1930 (the date of the explosion here involved), under the constant supervision of Mr. Meseck, supervising engineer for Burns & McDonnell. The connection between the main pipe line in the heating plant with the north end of the conduit line, installed by Pearce Company, was made in August, 1930. The pipe within the plant, as installed by Grunwald & Co., ran from the boilers west along the ceiling of the basement. It then dropped down from the ceiling at a right angle for about 7 feet and turned horizontally to join with the end of the conduit line left open by the Pearce Company just inside the wall of the plant. There the connection with that end of the conduit pipe was made by means of a steel flange. The other end of this last section of conduit pipe rested in an expansion joint in the tunnel, but no anchorage of any kind had been installed by the Pearce Company to hold it in the expansion joint. It was ultimately joined to the pipe connecting the heating plant by some workmen in the employ of the University. They installed an anchor consisting of a ⅝ inch steel cable which they passed two and one half times around the vertical section of the Grunwald pipe within the heating plant just above the elbow at the connection between the Pearce pipe and the Grunwald pipe, each end of the cable passing through a sleeve in the wall and out into the tunnel. One end of this cable was attached by clamps to a strap or bracket on the wall of the tunnel secured by bolts imbedded in the concrete. The other end of the cable was fastened to a similar strap on the wall by means of a turnbuckle with hooks on each end, one hook passing through the loop on the end of the cable and the other passing through an eye in the strap on the tunnel wall. The hook on the turnbuckle, which passed through the loop in the cable, was about ⅝ inch in diameter and was hand forged from wrought iron. Under whose supervision the installation was made is a matter in dispute. No attempt has been made to defend the design, materials, or strength of the anchor or hook. The plans and specifications of the heating plant required the conduit line to withstand a pressure of 250 pounds per square inch and a temperature of 150 degrees superheat. Under such operating conditions it was recognized that proper anchorage was a problem of engineering design and computation of the strength sufficient to hold the pipe in the expansion joint, with a proper allowance for a safety factor.

At about 1 o'clock in the afternoon of September 6, 1930, the construction work having been completed, steam was turned into the conduit line. About 4:30 p. m. the hook on the turnbuckle which passed through the loop in the cable of the anchor broke, permitting the pipe to pull out of the last expansion joint in the tunnel and the steam to escape in a violent explosion. Mr. Wasenmiller and a fellow workman, employees of the University, who were in the tunnel at the time, were severely scalded and died of their injuries within a few hours.

The petition set forth several grounds of alleged negligence, but only one was submitted to the jury under the instructions of the court, to wit: Was the Burns & McDonnell Engineering Company negligent in allowing the installation of this turnbuckle or hook as a part of the anchorage for the steam pipe? On that question the court charged that it was the duty of Mr. Meseck, as supervising engineer, to prevent the use of this hook, or the use of the steam pipe while the hook was being used, if as a reasonably prudent man he ought to have appreciated the danger of its use when steam was turned on, and if as a reasonably prudent man he ought to have known that employees might rightfully be in the tunnel and be subjected to danger from escaping steam, and that a failure to perform that duty would be evidence of negligence.

The appellant presents the following assignments of error: (1) That the court erred in sustaining the motion of the plaintiff to strike from the files the supplemental answer of the defendant, Robert E. McDonnell; (2) that the court erred in admitting in evidence the copy of the contract with Grunwald & Co.; (3) that the court erred in overruling the defendant's motion for a directed verdict; and (4) that the court erred in its charge to the jury on the issue of negligence.

1. In the so-called supplemental answer which the defendant McDonnell filed in the

federal court some four months after the removal of the cause to that court, it was alleged that the action of the state court in vacating its order of dismissal and reinstating the case was void because that judgment of dismissal had been entered by agreement between the parties and the defendant had performed his agreement and had objected to vacating the order of dismissal. The agreement as alleged was that the plaintiff in this case had agreed with the defendant McDonnell that the plaintiff should prepare and file in the District Court of the United States for the District of Nebraska, Lincoln Division, a petition upon the same cause of action as is alleged in the petition herein and that the defendant McDonnell would enter his voluntary appearance to the petition and would not file any motions to strike or to make definite and that thereupon this cause would be dismissed by agreement, each party to bear his own costs, all of which was done; but within a few hours the attorney for the plaintiff discovered (as he alleges) that he had been tricked in that he had inadvertently overlooked the fact (which his adversary had in mind) that the action, being brought under the Lord Campbell's Act of Nebraska, had to be begun within two years, and more than two years had elapsed at the time of the alleged agreement.

 It is the contention of the appellant under the first assignment of error that where the parties to an action agree to dismiss it and the court enters dismissal upon the agreement, that the court is without power, even at the same term, to set the dismissal aside over the objection of the defendant. The cases cited are: Ryan v. Phoenix Insurance Co., 204 Iowa, 655, 215 N. W. 749; Lyon v. Craig, 213 Iowa, 36, 238 N. W. 452; Simpson v. Brock, 114 Ga. 294, 40 S. E. 266; Weisguth v. Supreme Tribe of Ben Hur, 272 Ill. 541, 112 N. E. 350; Petty v. Piedmont Fertilizer Co., 146 Ga. 149, 90 S. E. 966; Johnson v. Harvester Mutual Fire Ins. Co., 259 Mich. 400, 243 N. W. 242; Bardach Iron & Steel Co. v. Tenenbaum, 136 Va. 163, 118 S. E. 502. But the present case was pending in Nebraska and the question is as to the Nebraska law. The decisions of that state are clearly to the effect that its district courts have plenary power over their judgments during the term at which they are rendered and may then vacate and set them aside whenever justice and equity require. Lacey v. Citizens' Lumber & Supply Co., 124 Neb. 813, 248 N. W. 378; Netusil v. Novak, 120 Neb. 751, 235 N. W. 335; Douglas County v. Broadwell, 96 Neb. 682, 148 N. W. 930;

Horton v. State, 63 Neb. 34, 88 N. W. 146; Bradley v. Slater, 55 Neb. 334, 75 N. W. 826; Keens v. Robertson, 46 Neb. 838, 65 N. W. 897; Burley v. Millard, 11 Neb. 286, 9 N. W. 46. A judgment by agreement stands upon no different footing in this regard than one resulting from decision. Burley v. Millard, supra; Keens v. Robertson, supra. Even if it had not been competent for the state court to vacate the order of dismissal as an exercise of discretion in furtherance of justice, it certainly had the power upon allegation and proof that the dismissal had been obtained by fraud. None of the cases cited suggests any questioning of such power. The record discloses that the plaintiff did charge deceit and fraud practiced upon her attorney as a ground for her motion to set aside the dismissal. It was a part of the agreement for the dismissal of this case in the state court that the defendant would not attempt to delay the trial of the suit in the federal court later than the May term, 1933, but (as plaintiff alleged to the state court) "the defendant's attorneys, in entering into said arrangement and understanding, were not in good faith and * * * secretly intended to * * * raise the bar of the statute of limitations." Whether or not the evidence heard by the state court was sufficient to justify its conclusion on the motion to vacate the dismissal, it is clear that the allegations made conferred the power upon the district court to vacate the dismissal and reinstate the case. On removal of causes to the federal court the general rule is that the federal court takes the case as it then is and does not review the rulings made by the state court within its jurisdiction while the cause was pending in that court. 28 USCA § 81; Duncan v. Gegan, 101 U. S. 810, 25 L. Ed. 875; Hatcher v. Hendrie & Bolthoff Mfg. Co. (C. C. A. 8) 133 F. 267; Guernsey v. Cross (C. C.) 153 F. 827; Denison v. Shawmut Min. Co. (C. C.) 124 F. 860; Bryant v. Thompson (C. C. Iowa) 27 F. 881; Davis v. St. Louis & S. F. Ry. (C. C. Kan.) 25 F. 786; Bragdon v. Perkins-Campbell Co. (C. C.) 82 F. 338; Harrington v. Denny (D. C. Mo.) 3 F. Supp. 584; Continental Nat. Bank v. Holland Banking Co. (C. C. A. 8) 66 F.(2d) 823; Taylor v. Scarborough (D. C. N. Y.) 56 F.(2d) 281. The supplemental answer of the defendant McDonnell was evidently drawn in recognition of the rule. It contains no allegation that the state court's order of dismissal was erroneous but only that it was void. The assignment that the trial court erred in striking the supplemental answer from the files is without merit.

2. As to the Grunwald contract:

While this was an action based upon the alleged negligence of the engineering firm, of which the defendant was a member, resulting in the death of the plaintiff's decedent, it was a necessary part of the plaintiff's case to establish that there was a duty upon the engineering firm by virtue of its undertakings with the Commission to supervise the construction and installation of the entire heating system, including the conduit line. The relation of the engineers to the Joint Commission, to the Pearce Company, and to Grunwald & Co. could only be established by an examination of the contracts under which the work was to be carried out. If these contracts established that the work in its entirety was to be supervised by engineers of the Burns & McDonnell Company, including final operating tests of the entire completed works, then it was its duty to inspect all the integral parts of the system, including the particular anchor that broke and caused the decedent's death. The Grunwald contract covered an important unit in the heating system and the relation of the defendant to that part of the construction was an important consideration in the case. The contract was admissible as it tended to establish the duty of the defendant to supervise the construction and installation of the entire plant, including the heating equipment under the Grunwald contract and the conduit pipe under the Pearce contract, and no prejudice is shown to have resulted from its introduction.

3. We pass then to a consideration of the third assignment of error denying the sufficiency of the evidence to support the verdict.

There is no dispute that the cause of the accident and death of Wasenmiller was the failure of the turnbuckle hook which formed a part of the anchor holding the last section of pipe in the tunnel into the socket of the expansion joint. The pleadings and proof presented the questions: First, whether there was a duty imposed upon the Burns & McDonnell Company to inspect and supervise the installation of the entire heating system and pipe line, including this anchor; and, second, if the answer be in the affirmative, did it breach that duty by permitting the particular anchor hook to be installed, knowing or having reasonable grounds to know that it was not suitable or fit to withstand the pressure to which the pipes would be subjected under the specifications in the contract?

Under its contract with the Commission the Burns & McDonnell Company agreed as follows:

"8. The Engineers agree to furnish a competent and experienced engineer for the supervision of the proposed improvements. He shall be equipped with all necessary instruments, and shall remain on the work during the period of construction, setting line and grade stakes, inspecting all material and construction work, making out monthly estimates of the amount of work completed and materials on hand, and shall also make monthly progress reports for the use and guidance of the Owner. The time of said supervising engineer's services shall begin at the notification of the Owner that the contractor is ready to begin the construction work, and shall terminate at the final completion of construction work."

"11. The engineering work, included in the above paragraphs includes machinery, equipment, and foundations therefor, but does not include the building or its foundations * * *."

"12. The Engineers agree to furnish consultant service on the conduit work, specifying the sizes of pipe and conduit and approving design. For this service, they will be paid one % of the actual cost of such construction and equipment at the time of awarding contracts for same."

The Commission entered into a separate agreement with Grant & Fulton, under which they were to design and supervise the construction of the conduit work, but "the engineers agree to collaborate with the firm of Burns and McDonnell Engineering Company who are to furnish consultant service on the conduit work, which firm will specify the sizes of pipe and conduit and approve design." Reading the provisions of these two contracts together, it is plain that Burns & McDonnell were to act as consultant engineers in the conduit work and that they had the duty of supervising its plan and design. If the design of the conduit line submitted by Grant & Fulton was unsatisfactory, it was the duty of Burns & McDonnell to specify changes that would bring the work within the specifications of the completed heating system. Design must include not only the mode of installation, but the type and kind of materials to be used in the construction, including anchors of the type called for in the specifications. That the Burns & McDonnell Company interpreted its duties to include inspections of the work on the conduit line

under the Pearce contract, even though Grant & Fulton had been employed to supervise the construction is evident from the fact that on September 6, 1929, Mr. Lambert of the Burns & McDonnell Company inspected the work being done on the conduit line and addressed the following letter to the Pearce Company: "The writer was in Lincoln yesterday and inspected the work you have been doing there. Everyone was much pleased with the way the work started off and we note that a great deal of progress has been made. It seems, however, that in the last week there have been delays in the shipment of some of your material and some talk of postponement of completion of the job. We trust that you will realize the seriousness of the situation and use every effort in your power to see that the work is facilitated and completed at an early date."

On September 27, 1929, Mr. Lambert wrote to the Commission as follows: "As you probably know, our supervising engineer arrived in Lincoln on the 23rd and will be on the job continuously until completion."

Evidently the Burns & McDonnell Company recognized a responsibility and a duty in the construction and installation of the conduit line beyond the mere specification of sizes of pipe and design. The contention of the appellant that the firm's duty was limited to the active supervision of the installation of the heating unit under the Grunwald contract is not borne out because work under the Grunwald contract did not begin until March, 1930, some six months after the supervising engineer arrived. Burns & McDonnell also approved the conduit line for final payment in February, 1930, and in June ordered that certain tightening and packing of joints should be undertaken by the Pearce Company at once. On September 13, 1930, the company made a formal report of the accident and after an inspection specified what changes and alterations would be necessary in the conduit line to render it suitable and safe for operation under the specifications.

The contract with Pearce Company provided that:

"Wherever the term 'Engineer' or 'Engineers' is used, it is understood to refer to Burns and McDonnell Engineering Company, Kansas City, Missouri, or Grant and Fulton, Lincoln, Nebraska, or their supervising Engineer or representative."

"Any defective material or workmanship may be rejected by the Engineer at any time before the final acceptance of the work, even though the same may have been previously overlooked and estimated for payment."

"Expansion joints shall be placed at intervals as required to take care of a maximum temperature change as may be required with steam at 250# pressure and 150 degrees superheat. The joints shall be suitable for operation under these conditions. * *. * All expansion joints and anchor specials shall be held in place by heavy cast iron anchors bolted to the fittings and embedded in masonry."

These provisions show that the Burns & McDonnell Company had a definite relationship to the work on the conduit line. The term "Engineers" was defined and referred either to the Burns & McDonnell Company or to Grant & Fulton. It was the engineers' duty to reject any defective material or workmanship. Furthermore, the contract specified the type of anchors to be employed on all expansion joints, and it is admitted that the Pearce Company did not install an anchor to hold the last section of pipe in the tunnel in its expansion joint. Its contract provided that all expansion joints should be held in place by heavy cast-iron anchors bolted to the fittings and embedded in masonry. Its failure to make such provision placed a duty upon the supervising engineer to see that a proper anchorage was installed to prevent the sleeve of the last section of pipe from slipping out of its expansion joint.

The appellant does not dispute the fact that the Burns & McDonnell Company had the duty of actively supervising the installation of the heating units in the plant by the Grunwald Company. The Grunwald contract also provided:

"Other Contracts: The Purchaser reserves the right to let other contracts in connection with the work. The Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work, and shall *properly connect and coordinate his work with theirs.*"

"Wherever work is being done by the Purchaser's forces or other contractors is contiguous to work covered by this contract, the respective rights of the various interests involved shall be established by the Engineer, in order to secure the completion of the various portions of the work in general harmony."

These provisions required Grunwald & Co. to co-ordinate its work with that of other contractors, and the rights of the respec-

tive parties were to be determined by the engineer (Burns & McDonnell).

When the Grunwald Company made the connection joining the heating units with the conduit line, it refused to install an anchor at that point to support the last section of the conduit pipe in the socket of the expansion joint on the ground that it was not within the terms of its contract. The Pearce work had been approved for payment and that company was no longer on the job; but Mr. Meseck, the supervising engineer of the Burns & McDonnell Company, was present and he recognized the necessity of adequately securing this pipe in its socket. It appears that the anchor actually provided was installed by workmen employed by the University while Mr. Meseck was actively supervising the work in the plant and before tests of the completed system had been undertaken. It was not, however, in conformity with the specifications covering the conduit work. The project contemplated a completed heating system and steam pipe line, and the work of each contractor was to be co-ordinated with that of the others. Active engineering supervision was provided in each contract. If an integral part of the completed plant failed to operate or function properly, the ultimate responsibility was upon those charged with the duty of passing upon all the elements and design of the completed system and the active supervision of the project. The anchorage of this last expansion joint was an important part of the system and presented one of the problems of co-ordinating the work on the conduit line with that in the plant proper and effecting a proper and suitable union. The evidence amply established that affirmative duties rested upon the Burns & McDonnell Company both as to the engineering problem and supervision.

There remains the question of negligence: Does the evidence establish that Burns & McDonnell Engineering Company breached its duty in failing to reject as unsuitable and unsafe the anchor which failed in this case, and which it is admitted was not suited to withstand the pressure under which the plant was designed to operate? Mr. Meseck was on the job for fifteen months including the day of the accident. He requested the Grunwald foreman to install an anchor, which the Grunwald Company declined to do. He personally supervised the installation of the sleeve in the wall through which the cable was passed. Although there is doubt under the evidence as to who designed or supervised the installation of the anchor, the matter is of no consequence in view of the duty of supervision and inspection which was imposed upon the Burns & McDonnell Company. Whether Mr. Meseck was negligent in permitting the installation of this form of anchor was submitted to the jury and in the light of the circumstances was an issue of fact upon which there is ample evidence to sustain the jury finding.

4. Much that has been said is pertinent to the appellant's assignment that the court erred in its charge to the jury. The appellant's argument in support of the assignment is directed to the part of the court's charge which imposes upon the engineer the duty of ordering the removal of parts that are unsuitable and unsafe in the operation of the completed plant. Being satisfied that the duty to supervise the entire project was imposed upon the engineers by the terms of the contracts, the question of their negligence was for the jury and the instructions properly submitted it.

We find no error, and the judgment is affirmed.